UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

SHARON AMBROSE,

    Plaintiff,

v.

PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS,

    Defendant.

Civil Action No. TDC-16-2998

## MEMORANDUM OPINION

Plaintiff Sharon Ambrose, who is self-represented, is a former probationary employee of Defendant Prince George's County Public Schools ("PGCPS") who has sued PGCPS for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2012). PGCPS has moved for summary judgment on Ambrose's claims. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6 (2016). For the reasons set forth below, PGCPS's Motion for Summary Judgment is GRANTED.

## BACKGROUND

On August 17, 2015, Ambrose started work with PGCPS as a "Secretary I," a 10-month, entry-level position in which she served as a student registrar and otherwise maintained student records. Joint Stmt. Undisputed Facts ("JSUF") ¶¶ 1-2, 5, ECF No. 37-2. Ambrose was initially a probationary employee who could be terminated without prior notice or the right to appeal within the first six months of her employment. Ambrose was assigned to two different schools. On Mondays, Wednesdays, and alternating Fridays, she worked at Kettering Elementary School

("Kettering"), whose principal, Joel Nelson, had interviewed and hired her. On Tuesdays, Thursdays, and the remaining Fridays, she worked at Skyline Elementary School ("Skyline"), where the principal was Mark Dennison.

October 23, 2015 was picture day at Kettering for students and staff. According to Ambrose, Principal Nelson did not invite her to be part of the staff group picture. Based on a conversation with Dennison, in which he told her that she did not have to come to Skyline Elementary School for the staff photograph, Ambrose understood that it was optional to take part in such a photograph.

December 4, 2015 was the make-up picture day at Kettering. That Friday morning, when Nelson arrived, Ambrose was at her desk, located outside of his office. As Nelson was about to walk into his office, he reminded Ambrose to go have her picture taken. Ambrose told him that she "preferred not to" have a photograph taken. Ambrose Dep. at 97, Joint Record ("J.R.") 26, ECF No. 42. She believed that since the October 23, 2015 photograph was optional, so was the December 4, 2015 photograph.

According to Ambrose, in response to her refusal, Nelson became "volatile and combative." Ambrose Dep. at 98, J.R. 26. While pointing to the door, he ordered Ambrose to "[g]et your stuff and "get out," stating that she was not a "team player." *Id.* Ambrose asked, "Over a picture?" Ambrose Dep. at 99, J.R. 26. Believing that she had been fired and fearing for her safety, Ambrose began to gather her belongings. Nelson also instructed her to send him an email about her decision not to have her picture taken.

At the time, there was a student sitting nearby, but no other staff members were present. Nelson had been yelling loudly enough that at least one other staff member, the school nurse, came out of her office to see what was going on. When Nelson saw the nurse, he asked Ambrose

to step into his office. Once in his office, Nelson continued to yell and rant, making Ambrose uncomfortable, so she stepped outside, using the excuse that she needed to get her purse. When she returned, Nelson closed the door, continued to speak in a raised voice, and called her an "idiot." Ambrose Dep. at 111, J.R. 29. After showing her some school photos on his desk, he told her that he had to go do his rounds and that she could "go back." Ambrose Dep. at 102, J.R. 27. At that point, it was between 11:30 a.m. and noon, the time Ambrose normally took her lunch. Ambrose grabbed her personal belongings and left. She did not inform anyone of her departure. Ambrose did, however, promptly contact the office of the PGCPS employee union and was advised to return to the school and submit a request for leave. About 30 minutes after leaving, Ambrose returned to Kettering, where she saw Nelson, who told her to take a break in the teacher's lounge. Ambrose instead told Nelson that she was requesting leave for the rest of the day, to which Principal Nelson answered "okay." Ambrose Dep. at 128, J.R. 33. Ambrose then entered a leave request in the school computer and left for the day.

According to Nelson, he did not raise his voice above what was normal for the office or make any threatening gestures during this encounter. Nelson acknowledges that he told Ambrose that she was not a team player, but denies telling her to get her stuff and get out. Rather, he contends that he told Ambrose that if she was not going to do as directed, she should leave for the day. Nelson recalls that while they were in his office, Ambrose explained her reason for not wanting to be photographed—stemming from an unpleasant experience she had with a photo while in high school—at which point he assured her that she did not have to be photographed and that she would not be written up as a result of the incident. According to Nelson, during the interaction, Ambrose asked several times if she could leave for the day. At

3

the end of the conversation, shortly before Ambrose was scheduled for lunch, he told her to take an early lunch and see how she felt when she came back.

The interaction between Ambrose and Nelson outside of his office was recorded on a school security camera. Although that video no longer exists, it was reviewed by Amana T. Simmons, the PGCPS Equal Employment Opportunity ("EEO") Advisor, who noted that, in the two-minute interaction, Nelson's manner was direct, and he made hand gestures while speaking. Throughout the interaction, the nearby student remained calm, suggesting that the interaction was not an "unusual altercation." J.R. 85. After Ambrose and Principal Nelson went into his office, they remained there for about six minutes. In Ambrose's estimation, the interaction constituted sex discrimination because she did not think Nelson "would have attacked a male as verbally as he attacked me as a female. And I don't think he would have demanded a picture from a male the way he demanded a picture from me, a female." Ambrose Dep. at 246, J.R. 63. According to Ambrose, Nelson has watched female employees on the security video. As evidence, she notes that on a previous occasion, when her daughter arrived to pick her up early, Nelson told Ambrose that she could not leave early. He later acknowledged that he knew about her planned early departure because he had watched her on the security video, which Ambrose found "creepy." Ambrose Dep. at 117, J.R. 31.

The Monday after the incident, December 7, Ambrose did not report to work at Kettering as scheduled, but instead requested leave. That day, Nelson sent her an email stating, "We missed you this morning. Call me when you get to Skyline." Ambrose Dep. at 149, J.R. 39. On Tuesday, December 8, 2015, in a meeting requested by the union, Ambrose, Nelson, and a union representative met at Kettering. Because she was scheduled to be at Skyline that day, Ambrose again requested leave. According to Ambrose, she told Nelson that she felt disrespected. Nelson

acknowledged that he had instructed Ambrose to get her things and get out, but he denied calling her an idiot and did not apologize for what had happened. Had he apologized, Ambrose would have returned to work. Based on the meeting, Ambrose was left with the impression that Nelson did not want her to return to work. She informed him that she was going to report the incident to the school district. Although she did not tell Nelson that she would not be returning to work, at the end of the meeting, she returned the keys to the school file room to him.

Later that day, Ambrose filed a Discrimination or Harassment Incident Report pursuant to Administrative Procedure 4170 (a "4170 Report") with the school district. In that 4170 Report, Ambrose described the incident as follows:

> Asked to take a yearbook picture by Mr. Nelson. When I stated that I preferred not to take a picture, he became hostile and used an intolerable tone and told me to "get my stuff and get out! He said I was not a team player." While I was packing up my stuff he said to send him an email. Then he said go to my office, where he called me an idiot and then he allowed me to go to lunch. Since I felt uneasy about the situation I went to lunch where I wrote down everything.

J.R. 75. Ambrose asked to be reassigned immediately. Ambrose also met with a representative from PGCPS Human Resources ("HR"), who told her that she would look for a new position for Ambrose within the school system, but that, in the meantime, Ambrose had to account for any absences from Kettering. At that point, Ambrose had no accrued annual leave, so she said that she would use sick leave.

The next day, December 9, 2015, HR informed Ambrose that she either had to return to work or resign. When Ambrose explained that she had a doctor's note excusing her from work through that Friday, she was told that she needed to get her leave approved or obtain an "absence without approval" letter from Nelson. J.R. 174. By this point, Ambrose understood that she had not been terminated.

Ambrose's request for leave for the days she did not report to Kettering—December 7, 9, and 14—was denied. In a December 15, 2015 letter to HR, Nelson requested that Ambrose be terminated due to poor attendance. He noted that she was a probationary employee and that she had "informed me she does not intend to return to work and has kept her word since." J.R. 77. On December 17, 2015, in response to this request, HR asked Ambrose if she had resigned. Ambrose reiterated that she had a doctor's note excusing her from work, stated that she had filed a complaint against Nelson, and requested that she be assigned to a school other than Kettering to go along with her assignment to Skyline. HR informed Ambrose that it had been asked to terminate her, not reassign her, because she had stopped reporting to work while still in her probationary period. HR continued, however, to seek an alternative placement for Ambrose.

That same day, Ambrose reported for her scheduled work day at Skyline. While she was there, Nelson arrived at Skyline for a meeting with other principals which included observing instruction of students with autism. Ambrose asserts that he repeatedly looked over at her while she was in the main office, which she felt was inappropriate. After seeing Nelson, Ambrose left the school without informing anyone or requesting leave. Nelson acknowledges visiting Skyline that day but has stated that he did not recall seeing Ambrose there.

On December 22, 2015, Nelson completed Ambrose's performance evaluation, the first one she had received from PGCPS. Within PGCPS, support staff are evaluated both in the middle of the year—in November, December, or January—and again at the end of the year. Nelson gave Ambrose a rating of "Needs Improvement," the second of three rating options, in the categories "Possesses and applies knowledge and skills necessary to job" and "Cooperates and works well with others." J.R. 79. He rated her as "Unsatisfactory," the lowest of the three rating options, in the categories "Regular attendance and punctuality" and "Demonstrates

initiative and interest in work." *Id.* In explaining his ratings, Nelson noted that Ambrose did not use Excel spreadsheets or send out letters to staff as required, that she needed multiple reminders for basic tasks, and that she had not returned to work since December 4, 2015. That evaluation was emailed to Ambrose on January 6, 2016. Ambrose refused to sign the evaluation because, in her estimation, it was not true.

Meanwhile, on January 5, 2016, pursuant to a request from HR for a summary of Ambrose's job performance, Dennison, the principal of Skyline, sent an email to HR confirming that Ambrose had left Skyline on December 17 without notification or approval and reporting problems with Ambrose's job performance, including "consistently" making errors in filing, having difficulty dealing with parents, and losing student documents. J.R. 205.

On January 11, 2016, Ambrose went to the HR office at PGCPS headquarters to report on Nelson's actions and ask about getting another position. She waited in the hallway for two hours to speak to someone. Finally, she was told that a supervisor was aware of her situation and that she would be contacted.

On January 28, 2016, Ambrose emailed Simmons, the EEO Advisor, to complain of what she termed "harassment." J.R. 81. That alleged harassment consisted of her December 17, 2015 interaction with Nelson at Skyline; the denials of her leave requests and resulting loss of pay; the December 17, 2015 call from HR in which she was told that if she did not return to work at Kettering, she would be terminated; her performance evaluation; Nelson's "paper[ing]" of her personnel file with negative reports; his ongoing interference with her ability to work; and her treatment by HR on January 11, 2016. J.R. 81-82. Ambrose's email was treated as a second 4170 Report, this one alleging retaliation.

7

In a February 8, 2016 report, Simmons issued a determination on Ambrose's first 4170 Report, concluding that Ambrose had not been subjected to discrimination or harassment in violation of Administrative Procedure 4170. Simmons reasoned that although it was clear that the December 4 incident between Ambrose and Nelson was not a "positive interaction," it did not amount to discrimination or a hostile work environment but was, at most, a personality conflict that was not actionable under Administrative Procedure 4170. J.R. 85.

On February 9, 2016, Ambrose, who was still a probationary employee, was given a letter formally terminating her employment with PGCPS. The letter stated that her termination was the result of her excessive use of leave, her abandonment of her position at Kettering, and performance deficiencies such as filing errors and subpar customer service skills.

On February 25, 2016, Simmons resolved Ambrose's second 4170 Report by finding that Ambrose's retaliation claim was unsubstantiated. She concluded that any loss of pay resulted from her failure to report to work, that there was no evidence that her performance evaluation was "bogus," that her personnel file contained no negative reports from Nelson, and that she had had only email interactions with Nelson since the December 4 incident. J.R. 89. Ambrose unsuccessfully appealed this determination.

On May 17, 2016, Ambrose filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). As the basis for discrimination, she checked the boxes for sex, age, and retaliation. In her factual narrative, she asserted:

> On December 4, 2015, I was subjected to harassment by Joel Nelson, Principal of Kettering Elementary School, when I was disrespected, called an idiot and told to get my stuff and get out. I filed an internal complaint of harassment on December 8, 2015 requesting to be transferred. On [December] 17, 2015, I began to be subjected to retaliation when I received a call threatening me with being fired and intimidated at Mr. Nelson's request. On January 6, 2016, I was given a poor evaluation by Mr. Nelson and continually denied transfer. I was discharged from my employment on February 11, 2016.

J.R. 100. In a May 16, 2016 letter, the EEOC investigator had informed Ambrose that the EEOC would not be pursing an investigation because, based on Ambrose's allegations in a previously provided intake questionnaire, she had provided no evidence of discrimination based on her membership in a protected class and had failed to establish that she had engaged in protected activity that could support a claim for retaliation. Specifically, the investigator noted that while Ambrose had filed a 4170 Report, "it was not filed because of your protected basis (race, sex, age, etc.) thus, it is not considered a protected activity." J.R. 101. On June 1, 2016, Ambrose received her official EEOC right-to-sue letter. Ambrose, proceeding *pro se*, filed suit in this Court on August 30, 2016 alleging two causes of action pursuant to Title VII: (1) "gender/sex harassment" and (2) retaliation. Compl. at 18-19.

## DISCUSSION

In seeking summary judgment on Ambrose's claims, PGCPS asserts that there is no evidence that Ambrose was subjected to discrimination or harassment on the basis of sex, and that Ambrose's retaliation claim necessarily fails because any complaints she made about her treatment did not allege discrimination or harassment based on her membership in a protected class. Rather than respond directly to these arguments, Ambrose generally asserts that it was illegal for her to be terminated while her 4170 Reports were under investigation. Alternatively, she asserts that her mistreatment and termination were the result of sex discrimination and sexual harassment because Nelson would not have treated a male employee in the same way that she was treated. As for her retaliation claim, Ambrose asserts that because her first 4170 Report opposed activities prohibited by Administrative Procedure 4170, such as inappropriate and unprofessional workplace behavior, her filing of the report constituted protected activity under Title VII. Although Ambrose also makes an argument that her claims can proceed under the

9

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, Ambrose has not pleaded a claim under the ADA, so the Court does not address this argument.

**I.     Legal Standard**

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

**II.    Count I: "Gender/Sex Harassment"**

Although Ambrose pleads Count I of her Complaint as a single cause of action, she appears to be alleging two distinct theories of liability: (1) sex discrimination and (2) sexual harassment, which the Court construes as a claim of a hostile work environment. *See Williams v. Silver Spring Volunteer Fire Dept.*, 86 F. Supp. 3d 398, 411 (D. Md. 2015) (stating that sexual harassment claims take two forms: (1) claims of a hostile work environment or (2) claims of *quid pro quo* sexual harassment). The Court addresses both theories.

A.  **Sex Discrimination**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To evaluate Title VII claims when, as here, there is no direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). The burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Id.* Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

To establish a *prima facie* claim for sex discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) the plaintiff's satisfactory job performance, (3) that the plaintiff was subjected to an adverse employment action, and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004). When the claim is discriminatory termination, the elements alter slightly. A plaintiff must then present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) that the plaintiff was terminated, (3) that at the time of the termination, the plaintiff was performing at a level that met the employer's legitimate expectations, and (4) that the position was filled by a

similarly qualified applicant from outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). There is no dispute that Ambrose, a woman, is a member of a protected class. The Court thus addresses the remaining factors.

Ambrose has asserted that she was subjected to sex discrimination because Nelson would never have treated a male employee in the way he treated her on December 4, 2015. If Ambrose's claim is that the December 4 incident constituted sex discrimination in the form of disparate treatment, it necessarily fails because there was no adverse employment action within the meaning of Title VII. "An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Although Ambrose initially believed that Nelson had fired her for declining to have her picture taken on December 4, she came to understand that she had not been terminated at that time. Rather, both HR and the union instructed her that she had to report for work unless she had secured approval of a leave request. Thus, at worst, the evidence viewed in the light most favorable to Ambrose shows that Nelson, by yelling at her for declining to have her picture taken and calling her an "idiot," had treated her in a disrespectful and improper manner. Such an encounter, even if motivated by discriminatory intent, does not constitute an adverse employment action for purposes of a claim of sex discrimination based on disparate treatment. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) ("[M]ere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect

the conditions of employment to implicate Title VII.") (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir. 1997) ("[N]ot every insult, slight, or unpleasantness gives rise to a valid Title VII claim."), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

If Ambrose's claim is that her ultimate termination was the result of sex discrimination, such a claim fails because the uncontested facts fail to establish the second prong of a *prima facie* case, that she was performing her job satisfactorily. By the time of her termination in February 2016, Ambrose had stopped going to work at Kettering entirely, despite being informed by both a union representative and an HR representative that she could not abandon her position. Because, as no one disputes, Ambrose was simply not doing her job, or at least that portion of it that she was expected to do at Kettering, she cannot be said to have been performing satisfactorily. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 761 (7th Cir. 2001) (affirming the district court's determination that the plaintiff had failed, on summary judgment, to make a *prima facie* case of national origin discrimination under Title VII in part because "within less than six weeks," the plaintiff had "violated the company's work attendance guidelines on no less than eight occasions" and thus was not meeting his employer's legitimate performance expectations). In addition, Ambrose offers no evidence that, as required for the fourth prong of a *prima facie* case, she was replaced by a similarly qualified person from outside her protected class. *See King*, 328 F.3d at 149.

Further, even if Ambrose had established a *prima facie* case of sex discrimination, in any form, her failure to report to work at Kettering qualifies as a legitimate, non-discriminatory reason for her termination which has not been undone by evidence of pretext. *Cf. Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (affirming the district court's determination

that, on a claim of discrimination under the ADA, the plaintiff's chronic absenteeism was a legitimate non-discriminatory reason for her termination).

More broadly, Ambrose provides no competent evidence that any of the events at issue were motivated by gender animus. She simply asserts her personal view that any disrespect directed to a woman is discriminatory. Beyond Ambrose's own personal speculation, there is nothing in the record to suggest that Nelson would not also have required a male employee to have a school photograph taken, or yelled at such an employee for failing to do so. Nor is there any evidence that a male probationary employee who had refused to return to work, even after inappropriate conduct by the principal, would have been allowed to continue working for PGCPS. Although Ambrose points to an incident when Nelson acknowledged watching her on the security video, the result of that monitoring was that Nelson admonished Ambrose for trying to leave work early. There was no evidence that Nelson would have treated a male employee seen leaving early in any different manner. With only Ambrose's speculation as a basis for her sex discrimination claim, the Court will grant summary judgment to PGCPS on this claim. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

### B. Hostile Work Environment

Alternatively, Ambrose alleges that the December 4 incident and its aftermath created a hostile work environment based on sex, in violation of Title VII. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto*, 786 F.3d at 277. To prove such a claim, a plaintiff must show that the offending behavior was (1) unwelcome, (2) based on gender, (3)

"sufficiently severe or pervasive" to alter the conditions of employment and create "an abusive atmosphere," and (4) imputable to the employer. *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207-08 (4th Cir. 2014) (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]allous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

Here, Ambrose's hostile work environment claim is based primarily on the December 4 incident. A single incident of abusive conduct toward an employee can establish a hostile work environment if the offensive action was egregiously severe. *See, e.g., Boyer-Liberto*, 786 F.3d at 280 ("[A] reasonable jury could find that [the supervisor's] two uses of the "porch monkey" epithet ... were severe enough to engender a hostile work environment."). However, even drawn in its starkest terms, Nelson's ranting against Ambrose for declining to sit for a school photograph is insufficiently severe. The encounter lasted less than 10 minutes, involved no physical contact, and included no terms more abusive than "idiot." Ambrose Dep. at 111, J.R. 29. Unlike in *Boyer-Liberto*, there was no explicit, odious racial slur or other comparably severe conduct that would support a finding that this single incident established a hostile work environment based on sex. *Boyer-Liberto*, 786 F.3d at 280.

Beyond the December 4 incident, the only arguably problematic encounter was Nelson allegedly looking at Ambrose while he was at Skyline for a principals' meeting. The remaining alleged harassment consisted of HR-related actions such as denials of leave requests, a negative performance evaluation, and warnings that Ambrose needed to report to work or face termination, not the "intimidation, ridicule, and insult" that forms the basis of a hostile work environment claim. *Boyer-Liberto*, 786 F.3d at 272. These circumstances fall well short of establishing a sex discrimination claim based on a hostile work environment. *See, e.g., Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (stating that allegations of the supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 312 (D. Md. 2015) ("And although being disrespectful to and yelling at an employee while ignoring her messages is not the hallmark of good conduct by a supervisor, 'even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.'" (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008))).

Finally, Ambrose claims, in her brief, that Nelson generally harassed her in the months before the December 4 incident, such as by changing her hours and becoming angry when she questioned the change. None of these additional factual assertions are part of the record on the Motion, so they cannot be considered. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346

F.3d 514, 522 (4th Cir. 2003) (stating that on summary judgment, a court may rely only on facts supported in the record, not simply assertions in the pleadings). Even if they could be considered, they do not alter the conclusion that Ambrose has presented insufficient evidence for a reasonable jury to find a hostile work environment based on sex. PGCPS is therefore entitled to summary judgment on Ambrose's sex discrimination and hostile work environment claims.

**III.  Retaliation**

Ambrose also alleges that the conduct following her filing of the 4170 Report constituted unlawful retaliation under Title VII. To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) "that there was a causal link between the two events." *Boyer-Liberto*, 786 F.3d at 281. As PGCPS points out, Ambrose's claim falls at the first hurdle.

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2 (delineating unlawful employment practices under Title VII). Here, Ambrose submitted two complaints to PGCPS that arguably could be considered protected activity: her December 8, 2015 4170 Report and her January 28, 2016 email to the PGCPS EEO Advisor. Although in these submissions, Ambrose complained of disrespectful treatment by Nelson on December 4, subsequent harassment in the form of rejected leave requests, and, in her estimation, an unjustifiably poor performance evaluation, in neither complaint did she explicitly or implicitly connect that alleged mistreatment to her membership in a protected class. In neither complaint

17

did Ambrose even reference that she is a woman. Where Ambrose never communicated to her employer "a belief that the employer has engaged in . . . employment discrimination" based on a protected class, there has been no protected activity. *Crawford v. Metrop. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009); *see Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 685–86 (4th Cir. 2009) (emphasizing, when applying Title VII retaliation analysis to an Age Discrimination in Employment Act claim, that "it is fundamental" that a plaintiff must have engaged "in activities opposing discrimination"); *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216–17 (4th Cir. 2002) (finding no ADA retaliation claim because the plaintiff could not reasonably believe that the conduct she had opposed violated the ADA, even though the opposed conduct could have violated state medical malpractice law); *Bowman v. Balt. City Bd. of Sch. Commr's*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) ("General complaints of unfair treatment are not protected activity."). As the EEOC investigator concluded, Ambrose's complaint was not filed on the basis of her membership in a protected class, such that she did not oppose any practice made unlawful by Title VII, as required to support a retaliation claim.

To the extent that Ambrose generally asserts that it was unlawful retaliation for PGCPS to terminate her while her 4170 Report was pending, her only cited authority for that proposition is Administrative Procedure 4170 itself, an internal PGCPS document. Because that procedure does not actually adopt such a limitation on termination, and adherence to internal policies is not independently actionable under Title VII, the Court finds that the timing of Ambrose's termination does not establish a genuine issue of material fact on the issue of retaliation. PGCPS will be granted summary judgment on Ambrose's retaliation claim.

In so ruling, the Court does not condone Nelson's conduct in the December 4 incident, which if consistent with Ambrose's description, was entirely inappropriate and justifiably upset

Ambrose. Nor does the Court validate PGCPS's decision to terminate Ambrose, a probationary employee, for refusing to work for Nelson, rather than find her an alternative assignment. The Court's limited mandate, however, is not to pass judgment on the behavior of a supervisor or HR practices, but to assess whether Ambrose has presented evidence sufficient to support a finding of sex discrimination, a hostile work environment, or unlawful retaliation under Title VII. Having concluded that she has not, the Court will grant summary judgment to PGCPS.

## CONCLUSION

For the foregoing reasons, PGCPS's Motion for Summary Judgment is GRANTED and this case DISMISSED. A separate Order shall issue.

Date: March 14, 2018

THEODORE D. CHUANG
United States District Judge